IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  11-cv-02554-RM-MEH

RONALD M. COX,

      Plaintiff,

v.

(DRDC) WARDEN ZAVISLAN (CDOC), and
(DRDC) CAPTAIN REAUX (CDOC),

      Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

_____

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court is Defendants' Motion for Summary Judgment [filed September 12, 2013; docket #106]. The motion is referred to this Court for recommendation. (Docket #107.) The matter is fully briefed and oral argument would not materially assist the Court in its adjudication of the motion. For the following reasons and based on the entire record herein, the Court RECOMMENDS that Defendants' motion be **GRANTED**.[1]

---

[1] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *In re Garcia*, 347 F. App'x 381, 382-83 (10th Cir. 2009).

## BACKGROUND

### I.     Procedural History

Plaintiff initiated this lawsuit *pro se* on September 29, 2011.  (Docket #1.)  His motion for leave to proceed *in forma pauperis* was granted on October 5, 2011.  (Docket #3.)  Although Plaintiff was initially incarcerated at Limon Correctional Facility, he is now housed at the Sterling Correctional Facility where he remains in the custody of the Colorado Department of Corrections ("CDOC").

Upon initial review of Plaintiff's original complaint, Magistrate Judge Boland directed Plaintiff to file an amended complaint within thirty days of the order.  (Docket #6.)  Plaintiff filed an "amended complaint" on December 22, 2011.  (Docket #9.)  Upon review of Plaintiff's amended complaint, Magistrate Judge Boland directed Plaintiff to file a second amended complaint within thirty days of the order.  (Docket #11.)  At Plaintiff's request, Magistrate Judge Boland extended the deadline through and including March 30, 2012.  (Docket #13.)  Plaintiff filed a Second Amended Complaint on February 28, 2012, which is the operative pleading in this action.  (Docket #14.)

Plaintiff's Second Amended Complaint has been construed as asserting four causes of action. In Claim 1, Plaintiff alleges that Defendants intentionally denied Plaintiff medical treatment in violation of the Eighth Amendment.  This claim has been divided into two sub-claims by the Court. (*See* docket #18 at 4.)  In Claim (1)(a), Plaintiff contends that he was denied due process of the law and subjected to cruel and unusual punishment when he was served a meal tray that contained two razor blades.  (*Id.*)  In Claim (1)(b), Plaintiff asserts that he was subjected to cruel and unusual punishment by Nurse Doug when he was denied timely medical treatment both on the night he

swallowed the razor blades and the following afternoon.  (*Id.*)  In Claim 2, Plaintiff argues that Captain Reaux, Warden Zavislan, and DOC Executive Director Tom Clements inflicted cruel and unusual punishment on Plaintiff in violation of the Eighth Amendment by subjecting him to illegal conditions of confinement and by denying him medical treatment in response to his ingestion of razors found in the prison food.  (Docket #14 at 8-9.)  In Claim 3, Plaintiff argues that Defendants conspired to deprive Plaintiff of his "federally guaranteed rights."  (*Id.* at 10.)

On March 20, 2012, during initial review, Judge Babcock issued an order dismissing Claims (1)(a) and 3 as legally frivolous and dismissing Correctional Officer Pastilletti, Lieutenant Carigan, Captain Zerbo, and DOC Executive Director Tom Clements as Defendants.  (Docket #18.)  Thereafter, Defendants filed a motion to dismiss the remaining claims; after briefing, this Court construed Claim 2 as consisting of two claims (2(a) for conditions of confinement and 2(b) for deliberate indifference to a serious medical need) and recommended that the District Court dismiss all claims against the Defendants in their official capacities, Claim (1)(b) against Nurse Doug in his individual capacity and Claim 2(a) against Captain Reaux and Warden Zavislan in their individual capacities.  (Docket #40.)  The District Court adopted the recommendation on March 12, 2013 (docket #67); therefore, the only claim remaining in this case is Claim 2(b) for deliberate indifference to Plaintiff's serious medical needs against Captain Reaux and Warden Zavislan in their individual capacities.

## II.    Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.

1.    Plaintiff Ronald Cox currently is incarcerated with the Colorado Department of Corrections

("CDOC"). Second Amended Complaint, docket #14 at 2.[2]

2.      On the night of May 28, 2011, Plaintiff reported that he believed he swallowed a razor blade

implanted in a cookie he ate. Ambulatory Health Record, Exh. A-1 to motion, docket #106-1.

3.      CDOC Nurse Doug Christiansen responded to Plaintiff's concerns at approximately 10:00

p.m. on May 28, and saw him again the next morning.  *Id.*  An on-call provider then referred

Plaintiff to Denver Health Medical Center ("Denver Health") for x-rays.  *Id.*

4.      Denver Health staff found that Plaintiff "ingest[ed] a foreign body" and initially

recommended that Plaintiff be monitored for 23 hours for passage of the foreign body.  Order for

Inpatient Admission or Observation Services, May 29, 2011, Exh. A-2 to motion, docket #106-2.

However, Plaintiff's stay at Denver Health extended to seven days, from May 29, 2011 through June

4, 2011.  Discharge Record/Instructions, Exh. A-3 to motion, Docket #106-3.

5.      While at Denver Health, Plaintiff's abdomen was x-rayed four times. The first x-ray, on May

29, 2011, revealed a spot that "could represent a razor blade or other foreign body."  X-Ray Final

Report, May 29, 2011, Exh. A-4 to motion, docket #106-4.

6.      On May 30, 2011, a second x-ray showed a "metallic foreign body" advancing through the

abdomen.  X-Ray Final Report, May 30, 2011, Exh. A-5 to motion, docket #106-5.

7.      The next day, a third x-ray showed a "metallic foreign body is located in the mid right

abdomen, likely ascending colon."  X-Ray Final Report, June 1, 2011, Exh. A-6 to motion, docket

#106-6.

---

[2]Typically, in the summary judgment context, a pro se litigant's verified complaint may be treated as an affidavit as long as it satisfies the standards for affidavits outlined in Rule 56.  *See Adams v. Dyer,* 223 F. App'x 757, 764 n.7 (10th Cir. 2007) (citing *Conaway v. Smith,* 853 F.2d 789, 792 (10th Cir. 1988)).

8.      On June 2, 2011, the fourth x-ray showed "what appears to be 2 separate razor blades" "in the right lower quadrant" of Plaintiff's abdomen. X-Ray Final Report, June 2, 2011, Exh. A-7 to motion, docket #106-7.

9.      The x-rays demonstrated the "probable progression of razor."  Progress Record, Exh. A-9 to motion, docket #106-9.

12.     On June 4, 2011, a Denver Health physician assessed the Plaintiff saying the x-rays "suggest that FB [foreign body] has migrated to R colon. It appears that the FB will likely pass per rectum." *Id.*

13.     The physician determined that "[t]his patient needs continued close observation until the FB passes. If he can [ ], be monitored at another facility by nursing & get daily AXR [x-ray], then transfer will be reasonable. Otherwise, he needs to stay @ CCMF until blades pass."  *Id.*

14.     The Plaintiff was discharged from Denver Health to the Denver Reception and Diagnostic Center ("DRDC") Infirmary on June 4, 2011; the Denver Health discharge record states, "no follow up needed unless razor does not pass."  Discharge Record/Instructions, Exh. A-3, docket #106-3.

15.     On Saturday, June 4, 2011, Plaintiff was transferred to the DRDC, where he was placed in a dry cell for further monitoring.  Removal from Population form, Exh. A-10, docket #106-10 at 3.

16.     A "dry cell" is "designated to securely house an offender without plumbing fixtures or plumbing fixtures that are capable of being shut off." AR 300-06(III)(I), Facility Security - Searches and Contraband Control, Exh. A-11, docket #106-11.

17.     A "dry cell watch" is "the process of continuous observation of an offender by Custody/ Control in an effort to obtain and search an offender's bodily wastes to determine that an offender may have ingested/swallowed contraband or otherwise concealed contraband within his/her body."

*Id.*, AR 300-06(III)(J).

18.     CDOC Administrative Regulations limit the amount of time an offender can remain in a dry cell to 72 hours.  *Id.*, AR 300-06(IV)(E)(6).

19.     In the dry cell, Plaintiff was monitored regularly by clinical and security staff from June 4, 2011 at 20:00 to June 7, 2011 at 07:25.  Dry Cell Observation Log, Exh. A-10, docket #106-10 at 4-8.

20.     At 10:30 a.m. on June 5, 2011, clinical staff reported, "P[atien]t states no medical concerns @ this time."  Later that day at 21:45, clinical staff also reported that no acute distress was noted.  Integrated Progress Notes, Exh. A-12, docket #106-12.

21.     Similarly, on June 6, 2011, clinical staff reported the absence of medical concerns and acute distress.  *Id.*

22.     On June 6, 2011, Dr. Gagandeep Singh saw the Plaintiff.  Dr. Singh reports that Plaintiff informed him, "now since hosp[ital] feels that he has had the razors pass thro[ugh] him – per p[atien]t had them in his rectum the day he was Dced [discharged] from DGH and states he passed the razors that day as he has no abd[ominal] discomfort/fever/chills/sob/ n/v/diarrohoea/HA."  Ambulatory Health Record, June 6, 2011, Exh. A-13, docket #106-13.

23.     Although Plaintiff reported being "asymptomatic," Dr. Singh ordered an additional x-ray to "eval[uate]" whether the foreign body "pas[s]ed."  *Id.*

24.     That x-ray revealed a "1.3 cm density overlying the midline pelvis at the level of the lower sacrum."  June 6, 2011 Report from Rocky Mountain Radiologists, P.C., Exh. A-14, docket #106-14.

25.     The following day, June 7, 2011, another medical provider, Physician's Assistant Chris Owusu, saw Plaintiff.  Mr. Owusu reports the Plaintiff "[c]urrently denies fever, chills, abd[ominal]

6

pain, red blood per rectum, SOB, dizziness, n/v." Mr. Owusu ordered another x-ray "for correlation/passage" of the foreign object. Ambulatory Health Record, June 7, 2011, Exh. A-15, docket #106-15.

26.     On June 7, 2011 at 20:00, the Plaintiff was released from the dry cell watch to the general inmate population.  Incident #464740 Report, Exh. A-16, docket #106-16.

27.     At the time of his release, clinical services staff examined Plaintiff and noted that he had "zero injuries" and "zero complaints." Clinical Services Anatomical Form, June 7, 2011, Exh. A-17, docket #106-17.

28.     The next day, on June 8, 2011, the Plaintiff's abdomen was x-rayed again. The x-ray revealed "[t]he radiodensity seen on 06/06/11 within or overlying the central lower pelvis is no longer present" and "no radiodense foreign body detected."  June 8, 2011 Report from Rocky Mountain Radiologists, P.C., Exh. A-18, docket #106-18.

29.     A month later, on July 13, 2011, Plaintiff's chest and abdomen were x-rayed again. The x-ray revealed "[n]o evidence of ingested radiopaque foreign body." July 13, 2011 Report from Pueblo Radiological Group, Exh. A-19, docket #106-19.

30.     On July 13, 2012, Plaintiff reported to a CDOC health provider that he swallowed pieces of his metal inhaler.  Ambulatory Health Record, July 13, 2012, Exh. A-20, docket #106-20.

31.     An x-ray was taken of Plaintiff's abdomen that day and revealed "no indication of intra[-]abdominal pathology or foreign bodies."  Ambulatory Health Record, July 13, 2012, Exh. A-21, docket #106-21.

32.     Dona Zavislan was the warden at DRDC in June 2011.  Affidavit of Dona Zavislan, September 10, 2013 ("Zavislan Affidavit"), ¶ 4, Exh. A-22, docket #106-22.

33.     Warden Zavislan was informed of Plaintiff's placement in a dry cell, and was updated periodically on his condition.  *Id.*, ¶¶ 6, 12.

34.     Warden Zavislan did not personally observe or interact with Plaintiff while he was in dry cell observation.  *Id.*, ¶ 13.

35.     Warden Zavislan did not review Plaintiff's medical records at any time; rather, she relied upon reports from clinical services for information about Plaintiff's medical condition and recommended courses of treatment.  *Id.*, ¶ 9.

36.     Warden Zavislan was not aware of any direction from a medical provider that Plaintiff should  be returned to the hospital if he did not pass the foreign object.  *Id.*, ¶ 14.

37.     Warden Zavislan's regular practice was to consult with staff, including clinical staff, as to the appropriate next steps when an offender is released from dry cell conditions.  *Id.*, ¶ 7.

38.     Warden Zavislan follows the recommendations of clinical staff as to the medical care offenders should receive; she cannot recall any instances in which she has overridden a recommendation for medical treatment made by clinical staff.  *Id.*, ¶ 10.

39.     Warden Zavislan does not recall knowing that a razor blade remained in Plaintiff's body at the time he was released from dry cell observation nor making any decisions relating to Plaintiff's transfer that would have been contrary to a medical directive.  *Id.*, ¶ 16.

40.     Clinical staff are not within the Warden's chain of command.  *Id.*, ¶ 11.

41.     Captain Lucille Reaux was the shift commander on June 5, 6 and 7, 2011 while the Plaintiff was held in dry cell for observation.  Affidavit of Lucille Reaux, September 11, 2013 ("Reaux Affidavit"),¶ 4, Exh. A-23, docket #106-23.

42.     As a captain, Captain Reaux did not have access to Plaintiff's medical records, and any

information she obtained about his medical condition or course of treatment would be entirely based on verbal reports to her from clinical staff.  *Id.*, ¶ 7.

43.     Captain Reaux's regular practice as a shift commander was to discuss an offender's medical status with clinical staff before releasing an inmate from dry cell observation.  *Id.*, ¶ 10.

44.     Captain Reaux follows the directions of clinical staff when it comes to issues relating to offenders' medical care.  *Id.*, ¶ 8.

45.     Captain Reaux does not recall doing anything other than following her regular practices with regard to Plaintiff's release from dry cell observation. *Id.*, ¶ 11.

46.     Captain Reaux was not aware of any instructions from a medical provider that Plaintiff should be returned to a medical facility if he did not pass the foreign object.  *Id.*, ¶ 9.

47.     Captain Reaux interacted with Plaintiff while he was in the dry cell, but did not observe that Plaintiff seemed to be in pain or that he needed medical attention. *Id.*, ¶ 6.

48.     CDOC Administrative Regulations provide a grievance process for offenders to resolve a variety of issues, including issues relating to health care concerns.  *See* Grievance Procedure, AR 850-04(IV)(D)(1), Exh. A-24, docket #106-24.

49.     AR 850-04 provides that grievances not in compliance with CDOC's regulations will be denied on procedural grounds and that, in such cases, the grievance officer shall certify that the offender has not exhausted the grievance process.  *Id.*, § (IV)(E)(3)(c)(2).

50.     AR 850-04 provides that "[e]ach grievance shall address only one problem or complaint and include a description of the relief requested."  *Id.*, § (IV)(D)(6).

51.     Plaintiff filed a grievance concerning razor blades allegedly implanted in his food, the co-pays charged for his medical care, and the medical care he received when a razor allegedly remained

inside him. Grievance Form, Step 1, June 29, 2011, Exh. A-25, docket #106-25 at 3.

52.     Plaintiff followed his grievance through Steps 2 and 3. Grievance Forms, Steps 2 and 3, *id.*
at 1-2.

53.     At Step 3, the CDOC grievance officer denied Plaintiff's grievance because he failed to
comply with the administrative regulation concerning the scope of grievances, saying that Plaintiff's
grievance contained multiple issues. October 20, 2011 Letter from Anthony DeCesaro to Ronald
Cox, Exh. A-26, docket #106-26.  As a result, the grievance officer determined that Plaintiff did not
exhaust his administrative remedies.  *Id.*

## STANDARDS OF REVIEW

### I.      Treatment of a *Pro Se* Plaintiff's Complaint

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less
stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not
supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory
on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations
and citations omitted).  The Tenth Circuit interpreted this rule to mean, "if the court can reasonably
read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite
the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor
syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*,
935 F.2d 1106, 1110 (10th Cir. 1991).  However, this interpretation is qualified in that it is not "the
proper function of the district court to assume the role of advocate for the pro se litigant." *Id.*; *see
also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188,
1197 (10th Cir. 1989)).

## II.    Dismissal under Fed. R. Civ. P. 56

Summary judgment serves the purpose of testing whether a trial is required. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The moving party bears the initial responsibility of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that the party is entitled to summary judgment as a matter of law. *Id.* at 323; *see also Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002) ("[s]ummary judgment is not proper merely because [plaintiff] failed to file a response").

If the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. *Hysten v. Burlington Northern and Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002); Fed. R. Civ. P. 56(e). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require

a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1256 (10th Cir. 2005).

## ANALYSIS

In the present motion, Defendants argue summary judgment is proper because Plaintiff failed to exhaust his administrative remedies and, in the alternative, Defendants are entitled to qualified immunity because no genuine issues of material fact exist demonstrating Defendants violated Plaintiff's Eighth Amendment rights. The Court will begin by analyzing whether Plaintiff failed to exhaust his administrative remedies as to the remaining claim; if he properly exhausted, the Court will proceed to determine whether Defendants are entitled to qualified immunity by examining whether genuine issues of material fact exist as to the remaining Eighth Amendment claim.

## I.    Exhaustion of Administrative Remedies

The Prison Litigation Reform Act requires a prisoner to exhaust available administrative remedies before suing over prison conditions. *See* 42 U.S.C. § 1997e(a); *see also Booth v. Churner*, 532 U.S. 731, 733 (2001). Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure. *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements ... that define the boundaries of proper exhaustion."); *see also Howard v. Waide*, 534 F.3d 1227, 1243-44 (10th Cir. 2008) ("Identifying the exact steps a prisoner must take to exhaust administrative remedies presents 'a choice-of-law issue,' derived from the requirements of 'the prison grievance systems themselves.'") (quoting from *Kikumura v. Osagie*, 461 F.3d 1269, 1282

(10th Cir. 2006), *overruled in part on other grounds as recognized in Robbins v. Oklahoma*, 519 F.3d 1242, 1246-47 (10th Cir. 2008)).  If a facility fails to notify inmates of the requirements for the content of a grievance, "a grievance [will] satisf[y] § 1997e(a)'s exhaustion requirement so long as it provides prison officials with enough information to investigate and address the inmate's complaint internally."  *Kikumura,* 461 F.3d at 1284.

Here, the CDOC Administrative Regulation ("AR") concerning its grievance procedure provides, in relevant part:

> 6.     Each grievance shall address only one problem or complaint and include a description of the relief requested. Problems that arise from the same incident or set of facts shall be grieved in one grievance, even though it may involve multiple DOC employees, contract workers or volunteers.
>
> 7.     A substantive issue or remedy may not be added at a later step if it has not been contained in each previous step of that particular grievance. All issues and remedies contained in the original grievance must be incorporated into each subsequent step of the grievance. Failure to renew each element of the complaint and/or requested relief in subsequent steps shall be deemed a waiver of those elements and/or requested remedy.

CDOC AR 850-04(IV)(D).  This information certainly informs an inmate of the requirement to limit a grievance to one complaint or problem at a time and that a substantive issue or requested remedy may not be added at a later step.  The grievance officer on October 20, 2011 informed the Plaintiff that he improperly identified in his Step 3 grievance: "multiple issues: [sic] (medical treatment for 3 medical complaints on different dates from 5/28/11 to 6/29/11: chest pains, ingested razors, sore throat), and co-pay issues regarding all medical complaints."  October 20, 2011 Letter, Exh. A-26, docket #106-26.  In fact, a comparison of the grievances, Steps 1-3, reveals the following:

> Step 1: Plaintiff reports he ingested 2 razor blades he believes were "implanted" into cookies on May 28, 2011, he "declared a medical emergency" that night and was seen by Nurse Doug who claimed Plaintiff may have bit himself, but when the bleeding continued, Plaintiff "declared another medical emergency" at 2:00 p.m. the

next day and he was taken to the hospital at which he spent a week after doctors discovered the ingestion of 2 razor blades. Plaintiff notes that the hospital staff "reported one (1) razor is still inside." As remedies, Plaintiff seeks immediate lab work to test for infectious diseases; immediate reimbursement of "medical emergency fee (x2)"; implementation of a policy to prevent food tampering; and monetary compensation for damages incurred.

Step 2: Plaintiff believes monetary compensation is justified as he was a "victim" of food tampering. He claims he declared emergencies on May 28 and May 29, 2011 as a result of spitting up blood and stomach pain. Plaintiff further complains he was placed in dry cell for 72 hours then released back to general population with a razor blade still in his system. As remedies, Plaintiff seeks immediate reimbursement of "medical fees (x3)"; the implementation of a policy to prevent food tampering; monetary compensation for damages incurred; and copies of "all reports and x-rays conducted that has [sic] to do with incident."

Step 3: Plaintiff asserts that "on the 28th of June I was charged and again on the 29th of June and then it says since I was dry celled in the Infermary [sic] I was charged for that also. I'm addressing the incident of callous indifference where I was a victim of food tampering. Records show that (2) razors were x-rayed showing in my stomach. Again I was a victim of a crime not a joke." As remedies, Plaintiff seeks immediate reimbursement of "medical charge (x3) stemming from D.R.D.C."; monetary compensation for damages incurred; copies of "medical reports of razor incident and x-ray results"; and the implementation of a policy to prevent food tampering.

Grievance Forms, Exh. A-25, docket #106-25. Although the single theme of his ingestion of razor blades occurs in all three grievances, it appears that in Step 1, Plaintiff complains that his food was tampered with and he was released from the hospital with a razor blade still in his system; in Step 2, he complains that he was released from the facility infirmary "back to general population" with a razor blade still in his system; and in Step 3, he complains that he was charged expenses for medical care. While the Court is unclear about Mr. DeCesaro's referral to Plaintiff's complaints of multiple medical issues such as "chest pains" or a "sore throat," which are not identified in the records provided by the Defendants, the Court agrees that Plaintiff improperly addressed more than one problem or complaint in his grievance and added substantive issues in later steps. *See* CDOC

AR 850-04(IV)(D)(6) & (7).

Plaintiff argues that prison officials did not follow AR 850-04(IV)(C)(2) by failing to ask him to cure procedural deficiencies.  However, the regulation also states: "If the procedural error cannot be corrected or if the offender refuses to correct the grievance, then it shall be ... denied on procedural grounds."  CDOC AR 850-04(IV)(C)(2).  Mr. DeCesaro concluded that the "time constraints outlined in the regulation had expired"; thus, the procedural errors could not be corrected.  Further, the regulation provides that at Step 3,

> The grievance officer may deny the grievance on procedural grounds without addressing the substantive issues, if the grievance is incomplete, inconsistent with a former step, incomprehensible, illegible, requests relief that is not available, fails to request relief, or in any other way fails to comply with the provisions of this regulation. When a grievance is denied for a procedural error, the grievance officer shall certify in the response that the offender has **not** exhausted the grievance process.

CDOC AR 850-04(IV)(E)(3)(c) (emphasis in original).

The Plaintiff fails to demonstrate any genuine issues of material fact with respect to whether he failed to exhaust administrative remedies.  Accordingly, the Court recommends that the District Court find the Plaintiff failed to follow the prison's grievance procedure and, thus, failed to exhaust his administrative remedies as to his Eighth Amendment deliberate indifference claim.

## II.      Qualified Immunity

Should the District Court disagree with the recommendation concerning exhaustion of administrative remedies, this Court recommends it find the existence of no genuine issues of material fact as to whether Defendants violated Plaintiff's Eighth Amendment rights.

Defendants assert that they are entitled to qualified immunity for claims against them in their individual capacities.  Qualified immunity protects from litigation a public official whose possible

violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is an entitlement not to stand trial or face the other burdens of litigation. *Ahmad v. Furlong,* 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). The privilege is an immunity from suit rather than a mere defense to liability. *Id.* When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009)).

The Supreme Court has discarded a review process that required courts to examine the elements of qualified immunity sequentially, first considering whether a right had been violated, and then second - if the court concluded a right had been violated - whether that right was clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 232-44. *Pearson* retired this process, instead affording courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

In this case, the Court will begin by analyzing Plaintiff's remaining claim to determine whether Plaintiff has established genuine issues of material fact as to a violation of his rights; if so, the Court will proceed to determine whether Plaintiff's rights were clearly established at the time of the violation.

Under the Eighth Amendment, prisoners are constitutionally entitled to "humane conditions

16

of confinement guided by 'contemporary standards of decency.'" *Penrod v. Zavaras*, 94 F.3d 1399,

1405 (10th Cir. 1996) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  Prisoners state a claim

of cruel and unusual punishment under the Eighth Amendment by alleging prison officials

demonstrated "deliberate indifference to a prisoner's serious illness or injury," or that prison

officials "have, with deliberate indifference," involuntarily exposed a prisoner to conditions "that

pose an unreasonable risk of serious damage to [the inmate's] future health." *Helling v. McKinney*,

509 U.S. 25, 35 (1993); *Estelle,* 429 U.S. at 105.

Plaintiff must meet both the objective and subjective components constituting the test for

Eighth Amendment deliberate indifference.  *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir.

2006).  The objective component is met "if the harm suffered is 'sufficiently serious' to implicate

the Cruel and Unusual Punishment Clause." *Id*. (quoting *Kikumura*, 461 F.3d at 1291).  "A medical

need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment

or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's

attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff*, 199

F.3d 1220, 1224 (10th Cir. 1999)).  "Moreover, a 'delay in medical care only constitutes an Eighth

Amendment violation where the plaintiff can show the delay resulted in substantial harm.'" *Mata*

*v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th

Cir. 2001)).  The substantial harm requirement may be satisfied by lifelong handicap, permanent

loss, or considerable pain.  *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001))

(internal quotations omitted).  A delay in medical treatment that is unintentional or unavoidable,

even though it may result in the inmate suffering additional harm, is not actionable.  *See, e.g.,*

*Estelle*, 429 U.S. at 104-05 ("indifference is manifested . . . by prison guards in *intentionally* denying

17

or delaying access to medical care") (emphasis in original).

The subjective component is met if the plaintiff demonstrates that a defendant "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan*, 471 F.3d at 1159 (quoting *Kikumura*, 461 F.3d at 1293). The subjective component requires an "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Kikumura*, 461 F.3d at 1293 (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)). To prove a claim of deliberate indifference predicated on the delay in providing medical care, an inmate must show: (i) that he suffered from a serious medical need; (ii) that medical care to address that need was unnecessarily delayed; (iii) that the delay manifested the defendant's subjective disregard for the inmate's needs; and (iv) that the delay caused the inmate to suffer substantial harm, whether in the form of significant pain or permanent physical injury. *Grassi v. Corr. Corp. of Am.*, No. 07-cv-00944-MSK, 2008 WL 5172154, at *5 (D. Colo. Dec. 9, 2008) (citing *Estelle*, 429 U.S. at 104-05).

For his remaining Claim 2(b), Plaintiff asserts that Captain Reaux and Warden Zavislan subjected him to cruel and unusual punishment when they failed to return Plaintiff to the hospital after one razor blade remained in his system. (Amended Complaint, docket #14 at 8.) As previously noted, x-rays of Plaintiff's stomach were taken at the hospital revealing that he had ingested two razor blades. While one blade apparently passed through Plaintiff during his hospital stay, a doctor there ordered that Plaintiff be released provided he could be closely monitored and x-rayed to determine whether the other blade had passed. Accordingly, Plaintiff's condition at that time constitutes a sufficiently serious medical need as "one that has been diagnosed by a physician as mandating treatment." *Sealock*, 218 F.3d at 1209. Thus, the Court finds that Plaintiff has properly

18

demonstrated a sufficiently serious medical need to meet the objective component of Claim (2)(b) against Captain Reaux and Warden Zavislan.

With respect to the subjective component, Plaintiff must demonstrate that Captain Reaux and Warden Zavislan acted with deliberate indifference to his serious medical need. *See Farmer*, 511 U.S. at 834. A prison official may be held liable when he acts with deliberate indifference "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. The official both must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference. *Id.* at 837. The deliberate indifference standard "is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care *or intentionally interfering with the treatment once prescribed*." *Estelle*, 429 U.S. at 104-05 (emphasis added). This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. *Id.* at 105. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain. *Id.*

Here, the facts demonstrate that Captain Reaux was aware that Plaintiff had ingested two razor blades, was taken to and treated at the hospital, and was placed in dry cell observation to monitor the passing of at least one razor blade. *See* Defendant Reaux's Responses to Plaintiff's First Request for Admissions, June 11, 2013, ¶¶ 4-5, docket #110-1 at 44. Warden Zavislan was aware that Plaintiff had ingested razor blades, she was kept updated during the dry cell observation, and she cannot recall whether she knew that Plaintiff still had a razor blade in his system when he was released into the general population on June 7, 2011. *See* Defendant Zavislan's Responses to

Plaintiff's First Request for Admissions, June 11, 2013, ¶¶ 5, 11, docket #110-1 at 38, 40.  However,

the facts demonstrate, and Defendants attest, that they were required to release the Plaintiff from dry

cell observation after 72 hours by CDOC AR 300-06(IV)(E)(6).  As to whether he was ordered to

be returned to the hospital after dry cell, there is nothing in the record demonstrating that Plaintiff

was discharged from the hospital with such instruction; rather, the hospital physician specifically

instructed that Plaintiff may be released from the hospital as long as he was monitored closely and

x-rayed every day to determine whether the razor blade had passed.  *See* Progress Record, Exh. A-9

to motion, docket #106-9; *see also* Discharge Record/Instructions, Exh. A-3, docket #106-3 ("no

follow up needed unless razor does not pass").

Plaintiff himself admits that he was x-rayed "every day" during dry cell (Plaintiff's

Declaration, June 3, 2012, docket #110 at 64), and the record reveals that Plaintiff was x-rayed the

day *after* he was released from dry cell (June 8, 2011 Report from Rocky Mountain Radiologists,

P.C., Exh. A-18, docket #106-18).  It was from this last x-ray that a radiologist determined the razor

blade was "no longer present."  *See id.* ("[t]he radiodensity seen on 06/06/11 within or overlying the

central lower pelvis is no longer present" and "no radiodense foreign body detected.").  A month

later, after Plaintiff complained to the facility clinical staff, he was x-rayed again, and again the x-

ray revealed "[n]o evidence of ingested radiopaque foreign body."  July 13, 2011 Report from

Pueblo Radiological Group, docket #106-19.

Importantly, Plaintiff fails to demonstrate he suffered any, much less substantial, harm as a

result of being released from dry cell to the general population with a razor blade in his system.  The

record indicates that Plaintiff complained of no health problems during dry cell (*see* Integrated

Progress Notes, Exh. A-12, docket #106-12), and the clinical staff who visited him during that time

concluded that Plaintiff "states he passed the razors that day as he has no abd[ominal] discomfort/fever/chills/sob/ n/v/diarrohoea/HA."  Ambulatory Health Record, June 6, 2011, Exh. A-13, docket #106-13.  On the day Plaintiff was discharged from dry cell, clinical staff found that Plaintiff "[c]urrently denies fever, chills, abd[ominal] pain, red blood per rectum, SOB, dizziness, n/v."  Ambulatory Health Record, June 7, 2011, Exh. A-15, docket #106-15.

The Defendants attest that based upon these findings and the clinical staff's recommendation, Plaintiff was released from dry cell into the general population on June 7, 2011.  Zavislan Affidavit, ¶¶ 7, 10, Exh. A-22, docket #106-22; Reaux Affidavit, ¶¶ 7, 10, Exh. A-23, docket #106-23.  Plaintiff fails to rebut the records showing that he suffered no harm upon his release into general population on June 7, 2011 and fails to rebut Defendants' testimony concerning their reliance on clinical staff's recommendations.  Thus, the Court must conclude that Plaintiff fails to demonstrate genuine issues of material fact concerning whether Defendants knew they faced a substantial risk of harm to Plaintiff and disregarded that risk.

Although Plaintiff speculates that the sore throat and mouth sores he suffered in late June-early July 2011 were the result of swallowing the razors, there is nothing in the record demonstrating that ingestion of the razors on May 28, 2011 caused such problems.  In fact, when the Plaintiff visited the facility clinic on June 25, 2011 to complain of a sore throat, he told the staff that he felt the same as he had the year before when he suffered strep throat.  Ambulatory Health Record, June 25, 2011, docket #110 at 53.  Plaintiff was treated with antibiotics for an "acute pharyngitis" (Ambulatory Health Records, June 27-29, 2011, docket #110 at 54-56), which resolved a few weeks later (Ambulatory Health Record, July 18, 2011, docket #110 at 62).  As for the mouth sores, Plaintiff had a dental examination on July 5, 2011, at which the doctor determined that the sores

were healing and "appear[ed] herpetic in origin." Ambulatory Health Record, July 5, 2011, docket #110 at 58. There is no evidence that a doctor or other health provider determined that his mouth and throat issues were caused by ingestion of the razor blades or having a blade in his system when he was released into general population on June 7, 2011.

Thus, the Plaintiff has failed to demonstrate any issues of material fact concerning whether Defendants Captain Reaux and Warden Zavislan disregarded a "substantial risk of serious harm" to Plaintiff by releasing him to general population upon completion of his three-day drycell period. *See Farmer*, 511 U.S. at 847. Accordingly, the Court finds that Plaintiff has not met the subjective component of his Eighth Amendment claim against Captain Reaux and Warden Zavislan and recommends that the District Court grant summary judgment in favor of the Defendants as to Plaintiff's remaining claim.

## III.    Damages

Defendants claim that Plaintiff has failed to demonstrate a physical injury to support his claims seeking damages for pain and suffering as required by 42 U.S.C. § 1997e. Should the District Court disagree that summary judgment is proper as to Plaintiff's Eighth Amendment claim, the Court will proceed to determine whether Plaintiff may seek compensatory damages in this case.

"While claims for mental and emotional distress are cognizable under § 1983, under [42 U.S.C.] § 1997e(e) 'such a suit [by a prisoner] cannot stand unless the plaintiff has suffered a physical injury in addition to mental or emotional harms.'" *Lawson v. Engleman*, 67 F. App'x 524, 526-27 (10th Cir. 2003) (quoting *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 807 (10th Cir. 1999)); *see also Turner v. Schultz*, 130 F. Supp. 2d 1216, 1222-23 (D. Colo. 2001) (quoting *Perkins*, 165 F.3d at 807). "[A] prisoner cannot satisfy Section 1997e(e) by alleging only that he suffered

from the physical manifestations of mental or emotional injuries." *Hughes v. Colorado Dep't of Corr.*, 594 F. Supp. 2d 1226, 1238 (D. Colo. 2009) (citations omitted).

As set forth above, the Plaintiff has failed to show he suffered a physical injury as a result of being released from dry cell into the general population by the Defendants in this case. Therefore, the Court recommends finding that Plaintiff may not seek compensatory damages against Defendants for his remaining Eighth Amendment claim.

<u>CONCLUSION</u>

The Court concludes that Plaintiff failed to exhaust his administrative remedies as to his remaining Claim 2(b) by failing to follow the applicable facility regulation. In the alternative, the Court finds Plaintiff has failed to demonstrate genuine issues of material fact as to the subjective component of his Eighth Amendment claim and, thus, Captain Reaux and Warden Zavislan are entitled to qualified immunity as to Claim (2)(b). Accordingly, the Court RECOMMENDS that Defendants' Motion for Summary Judgment [filed September 12, 2013; docket #106] be **GRANTED** as set forth herein.

Respectfully submitted at Denver, Colorado, this 12th day of November, 2013.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

23